DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} While finishing framing and installing the roof rafters of Joseph and Vanessa Hanna's house, Quality Home Construction Inc. caused the frame to go out of plumb and out of square, leading to problems with the roof, doors, drywall, wood trim, and windows. A magistrate determined that Ohio Casualty Insurance Co. had to indemnify Quality for the damage to the drywall, wood trim, doors, and roof shingles, but not for damage to the frame, roof rafters, and windows. Ohio Casualty and the Hannas filed objections, but the trial court overruled them. This Court reverses because the responsibility to indemnify Quality must be apportioned between Ohio Casualty and Motorists Mutual Insurance Co. Those companies must also indemnify Quality for the damage to the Hannas' casement windows. *Page 2 
 FACTS {¶ 2} The material facts of this case are not disputed. Mr. Hanna began constructing a house in Westfield Township in the summer of 2002. He hired Amish workers to frame the house, but a tornado leveled it a few months later. The Amish workers began framing the house again, but had to stop when the weather turned cold. Mr. Hanna hired Quality to complete the job. By the end of 2002, it had completed the interior and exterior framing of the house, had sheathed the house with plywood, had installed the roof rafters, and had installed the Hannas' prefabricated casement windows.
 {¶ 3} The Hannas offered expert testimony that, at the time Quality took over construction, the house's walls were square and plumb. As it finished framing the house and installing the roof rafters, however, it prematurely removed some of the wall supports, causing the exterior walls to lean outward and become out of plumb and out of square. The out-of-plumb and out-of-square walls created several problems. At first, the only noticeable problem was a bow in the roof line. Mr. Hanna's drywall hanger later noticed that the entire house was crooked.
 {¶ 4} Because of the crooked framing, the drywall is cracked in places, visibly crooked in the corners, and does not meet the ceiling properly. The roof is noticeably bowed. Although Mr. Hanna hired a skilled trim carpenter to install custom doors, they do not operate or seal properly. Because the windows were installed out of plumb, they do not open and close correctly and their gears are experiencing premature wear. The windows' manufacturer voided their warranty because they were installed out of plumb.
 {¶ 5} When the Hannas sued Quality, Ohio Casualty filed a separate action, seeking a declaration that it does not have to indemnify Quality for its poor workmanship. Ohio Casualty *Page 3 
had insured Quality during the time it worked on the Hannas' house. Motorists Mutual intervened in the action because it insured Quality when the doors, drywall, wood trim, and roof shingles were installed. The magistrate determined that, because all the work performed by Quality was completed while Ohio Casualty insured it, Ohio Casualty's policy applied. He also determined that any property damage directly caused by Quality's poor workmanship is excluded from coverage. Property damage that was collateral or consequential, however, is covered by the policy. Applying that rule to the facts of the case, he determined that Quality's framing work, roof rafter installation, and window installations were excluded from coverage. Problems with the house's drywall, wood trim, doors, and roof shingles were not excluded. The parties filed objections, but the trial court overruled them, affirming the magistrate's decision. The Hannas have appealed, assigning one error. Ohio Casualty has cross-appealed, assigning four errors.
 STANDARD OF REVIEW {¶ 6} "The interpretation of an insurance contract involves a question of law." Leber v. Smith, 70 Ohio St. 3d 548, 553 (1994). Its construction "is reviewed de novo on appeal, without any deference afforded to the result that was reached below." Malaski v. FraminghamLane Condo. Ass'n, 9th Dist. No. 20805, 2002-Ohio-2324, at ¶ 8. "Where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." King v. Nationwide Ins.Co., 35 Ohio St. 3d 208, syllabus (1988). "When the language of an insurance policy has a plain and ordinary meaning, it is unnecessary and impermissible for [a] court to resort to construction of that language."Karabin v. State Auto. Mut. Ins. Co., 10 Ohio St. 3d 163, 166-67 (1984). "A court must give undefined words used in an insurance contract their plain and ordinary meaning." Nationwide Mut. Fire Ins. Co. v. GumanBros. Farm, 73 Ohio St. 3d 107, 108 (1995). *Page 4 
 COMMERCIAL GENERAL LIABILITY POLICY {¶ 7} Ohio Casualty's policy provides that it "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." The insurance applies "only if: (1) [t]he `bodily injury' or `property damage' is caused by an `occurrence' that takes place in the `coverage territory'; and (2) [t]he `bodily injury' or `property damage' occurs during the policy period." The policy defines "[p]roperty damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured." The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."
 {¶ 8} The policy also contains two relevant exclusions. There is no coverage for property damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because `your work' was incorrectly performed on it." There is also no coverage for property damage "to `your work' arising out of it or any part of it and included in the `products-completed operations hazard.'" The policy defines "your work" as "[w]ork or operations performed by you or on your behalf," and "[m]aterials, parts, or equipment furnished in connection with such work or operations." It defines "products-completed operations hazard" in part as "all `bodily injury' and `property damage' occurring away from premises you own or rent and arising out of . . . `your work' except . . . [w]ork that has not yet been completed or abandoned."
 PROPERTY DAMAGE {¶ 9} Because Ohio Casualty has argued that Quality has no right to indemnification, this Court will consider its arguments first. Ohio Casualty's first assignment of error is that the *Page 5 
trial court incorrectly concluded that the intentional alteration of fixtures constituted "property damage." It has argued that the house's drywall is not "damaged," but is merely cosmetically unattractive because it was knowingly and intentionally installed over a crooked frame. It has argued that the house's doors and wood trim are not "damaged," because, at worst, extra work was required to install them over the crooked frame. The only complaint about them is that they are unattractive.
 {¶ 10} Whether there was "property damage" under the insurance policy depends on whether there was "physical injury" or "loss of use of tangible property." "Physical injury" is not defined in the policy, but the Eighth District Court of Appeals has recently construed it to mean "a harm to the property that adversely affects the structural integrity of the house." Mastellone v. Lightning Rod Mut. Ins. Co.,175 Ohio App. 3d 23, 2008-Ohio-311, at ¶ 61.
 {¶ 11} Ohio Casualty's argument focuses on the wrong events. The physical injury that triggered coverage was not the cosmetic changes to the drywall, wood trim, and doors. Rather, it was Quality causing the house to be framed out of plumb and out of square. Crooked framing is a harm that adversely affects the structural integrity of a house. Quality's causing the frame of the Hannas' house to become crooked as it finished framing the house and installed the roof rafters, therefore, was "property damage" under the terms of the policy. Under the definition of "property damage," that includes the Hannas' "loss of use" of having a house constructed with out-of-plumb and out-of-square walls, including any collateral damage to the house's drywall, doors, wood trim, and roof shingles.
 {¶ 12} Ohio Casualty's argument is also premature. Its policy provides that it "will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' . . ." There is no question that the cosmetic changes to the doors, *Page 6 
drywall, and wood trim were made "because of" the house's crooked frame. Whether Ohio Casualty must indemnify Quality for those alterations, therefore, depends on whether they are "those sums that [Quality] becomes legally obligated to pay as damages." That issue will be decided in the action filed by the Hannas against Quality. Ohio Casualty's first assignment of error is overruled.
 OCCURRENCE {¶ 13} Ohio Casualty's second assignment of error is that the trial court incorrectly concluded that the intentional alteration of fixtures constituted an "occurrence." Specifically, it has argued that the intentional alteration of the drywall, wood trim, and doors did not constitute an "accident" under the terms of its policy.
 {¶ 14} The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Identical language was at issue in Indiana Ins. Co.v. Alloyd Insulation Co., 2d Dist. No. 18979, 2002-Ohio-3916, at ¶ 17. In Indiana Ins. Co., an insurance company sought a declaration that it had no duty to indemnify a roofing company after defects in the roofing company's work resulted in corrosion and other damage to a library board's property. Id. at ¶ 2-3. The insurance company argued that any defects in the roofing company's work were not an "accident" under the policy's "occurrence" definition "because they are risks of a kind covered by an errors or omissions policy, or perhaps a performance bond." Id. at ¶ 30. Although the court agreed with the insurance company's premise, it noted that the library board's claim was "for the result of those defects, not the defects themselves." Id. "The question [was] whether those results are an occurrence in the nature of an accident that the policy covers." Id. *Page 7 
 {¶ 15} The court concluded that the "accident" under the terms of the policy was "the corrosion and other damage to the Library Board's property that were allegedly caused by the work that [the roofing company] performed . . . ."Id. at ¶ 31. The court further concluded that "[t]hose consequential damages are an `occurrence' under the terms of the policy because they [were] `an accident, including continuous exposure, or repeated exposure to substantially the same general harmful conditions.'" Id. The court, however, explained that "[t]he alleged faulty workmanship is itself not covered." Id.
 {¶ 16} This Court has found Indiana Ins. Co. persuasive. SeeWestfield Ins. Co. v. Coastal Group Inc., 9th Dist. No. 05CA008664,2006-Ohio-153, at ¶ 11-12. In Westfield Ins. Co., this Court noted that commercial general liability policies are not intended to insure "risks that are the normal, frequent, or predictable consequence of doing business." Id. at ¶ 10 (quoting Heile v. Herrmann, 136 Ohio App. 3d 351,353 (1999)). Citing Indiana Ins. Co., it explained that a commercial general liability policy "will not provide coverage if faulty workmanship is the accident, but will provide coverage if faulty workmanship causes the accident." Id. at ¶ 12 (emphasis in original); see Interstate Properties v. Prasanna Inc., 9th Dist. Nos. 22734, 22757,2006-Ohio-2686, at ¶ 45 (distinguishing between "damages that are the poor work product itself and those that are collateral or consequential to it"). It concluded "that `delay' does not fit within the ordinary meaning of the term `accident.'" Westfield Ins. Co., 2006-Ohio-153, at ¶ 13.
 {¶ 17} Accordingly, the question under Indiana Ins. Co. andWestfield Ins. Co. is whether Quality's faulty workmanship caused "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Quality improperly finished framing the house and improperly installed the roof rafters, causing the house to have crooked walls that were out of plumb and out of square. This Court concludes that the resulting defective *Page 8 
supporting frame system constituted an "occurrence" because it was caused by "an accident, including continuous . . . exposure to substantially the same general harmful conditions," namely, Quality's faulty work. Ohio Casualty's second assignment of error is overruled.
 POLICY PERIOD {¶ 18} Ohio Casualty's third assignment of error is that the trial court incorrectly held that there was collateral damage to the drywall, wood trim, doors, and roof shingles within its policy's coverage period. It has noted that it only insured Quality through January 20, 2003, but the problems with those fixtures were not discovered until after that date. In fact, none of those fixtures was even installed until after its policy expired. Accordingly, it has argued that its policy does not apply because any damage occurred outside its policy's period.
 {¶ 19} As explained above, the "property damage" to the Hannas' house was Quality causing its frame to become crooked, including the Hannas' loss of use of plumb and square walls. It is undisputed that Quality completed all of its work on the house before the end of 2002 and that Ohio Casualty insured Quality until January 20, 2003. The damage to the house's drywall, doors, wood trim, and roof shingles was merely collateral damage arising out of the house's defective supporting frame system. There is no requirement in the policy that collateral damages flowing from the initial "property damage" must occur during the policy period. Accordingly, Ohio Casualty's argument that it does not have to indemnify Quality for damage to the drywall, doors, wood trim, and roof shingles because those damages did not "occur" during its policy period is without merit. Ohio Casualty's third assignment of error is overruled.
 APPORTIONMENT {¶ 20} Ohio Casualty's fourth assignment of error is that the trial court incorrectly assigned it all of the duty to indemnify. Ohio Casualty has argued that, because some of the *Page 9 
damages to the house did not occur until after it stopped insuring Quality, the duty to indemnify should be apportioned between it and Quality's subsequent insurer, Motorists Mutual. Motorists Mutual has argued that its coverage was not triggered, but even if it was, Ohio Casualty should bear the full burden of indemnifying Quality because Ohio Casualty has unclean hands.
 {¶ 21} This Court must first determine whether Motorists Mutual owed Quality a duty to indemnify under the facts of this case. Its policy contains language that was identical to Ohio Casualty's. Motorists Mutual agreed to "pay those sums that [Quality] becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies." The policy "applie[d] to `bodily injury' and `property damage' only if: (1) [t]he `bodily injury' or `property damage' is caused by an `occurrence' . . .; and (2) [t]he `bodily injury' or `property damage' occurs during the policy period. . . ."
 {¶ 22} Ohio Casualty and Motorists Mutual's policies "are `occurrence' policies, i.e., they provide coverage for claims resulting from injury or damage that is based upon an occurrence during the policy period, regardless of when the claim is made." Pilkington N. Am. Inc. v.Travelers Cas. Sur. Co., 112 Ohio St. 3d 482, 2006-Ohio-6551, at ¶ 24. "[An] insurer's coverage obligation in an occurrence policy arises at the time of the occurrence." Id. at ¶ 25. If an occurrence is continuous, however, it may trigger multiple policies. Goodyear Tire Rubber Co. v. Aetna Cas. Sur. Co., 95 Ohio St. 3d 512,2002-Ohio-2842, at ¶ 5; Plum v. W. Am. Ins. Co., 1st Dist. No. C-050115,2006-Ohio-452, at ¶ 16. Because the house's defective supporting frame system continued into the time period Motorists Mutual insured Quality, this Court concludes that its policy was also triggered.
 {¶ 23} In its post-trial brief, Ohio Casualty argued that the magistrate should apportion damages based on "time on risk." Because it insured Quality for only 2 months following the *Page 10 
initial "property damage" while Motorists Mutual insured Quality for 12 months, Ohio Casualty argued it should only have to indemnify Quality for one-seventh of the Hannas' damages. The magistrate declined to apply a "`continuous trigger' theory," however, because Ohio Casualty caused Mr. Hanna to suspend construction for three or four months during Motorists Mutual's policy period while it investigated whether it owed a duty to indemnify Quality. Motorists Mutual has further argued that Ohio Casualty has unclean hands because it did not disclose the results of its investigation and because it told Mr. Hanna that he could continue his work on the house, which resulted in additional damages.
 {¶ 24} Although Ohio Casualty told Mr. Hanna to suspend construction for three or four months, that did not warrant placing the entire indemnification burden on Ohio Casualty. At most, equity requires placing the burden of indemnification for those extra months on Ohio Casualty. Regarding Motorists Mutual's unclean hands argument, it has not established that Ohio Casualty had a duty to disclose the results of its investigation to a third party that it did not insure or that Mr. Hanna would have stopped construction on his house if he had seen the report. Even without the report, Mr. Hanna knew that the house's frame was crooked, but chose to continue construction because he could not afford to start over. Ohio Casualty's fourth assignment of error is sustained.
 WINDOW DAMAGE {¶ 25} The Hannas' sole assignment of error is that the trial court incorrectly applied Ohio Casualty's policy's "your work" exclusions to their claim for collateral damage to their prefabricated casement windows. They have argued that they are not seeking to recover for Quality's improper installation of the windows, but only for the collateral damage to the windows' cranks and gears caused by opening and closing the windows while they are hanging *Page 11 
out-of-plumb. That damage did not occur during Quality's installation of the windows, but only began when the windows were first operated months later.
 {¶ 26} The magistrate identified two "your work" exclusions but did not explain which one he thought applied. This Court, therefore, will examine the Hannas' claim under both exclusions. The first excludes "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because `your work' was incorrectly performed on it. . . . [T]his exclusion does not apply to `property damage' included in the `products-completed operations hazard.'" The Hannas have argued that the collateral damage to their windows does not fall within this exclusion because it is included in the "products-completed operations hazard." The policy defined that term in part as "all `bodily injury' and `property damage' occurring away from premises you own or rent and arising out of . . . `your work' except . . . [w]ork that has not yet been completed or abandoned."
 {¶ 27} This Court agrees that the "products-completed operations hazard" exception applies. Although the damage to the windows' cranks and gears arose out of Quality's out-of-plumb installation of the windows, it did not occur while Quality was installing them and did not occur until after Quality finished its work on the house. See Spears v.Smith, 117 Ohio App. 3d 262, 267 (1996) (concluding "completed operations" exception applied when damage occurred at a home construction site that the builder did not own or rent, the damage arose out of the builder's work on the floor support system, and the home was no longer in the builder's possession when it occurred). Accordingly, even though the windows may need replacement or repair because Quality installed them out of plumb, because any damage to them did not begin until after it finished its work, the first exclusion does not apply. *Page 12 
 {¶ 28} The second "your work" exclusion that the magistrate identified applies to "`property damage' to `your work' arising out of it or any part of it and included in the `products-completed operations hazard.' This exclusion does not apply if the damaged work . . . was performed on your behalf by a subcontractor." In Erie Ins. Exch. v. Colony Dev.Corp., 10th Dist. Nos. 02AP-1087, 02AP-1088, 2003-Ohio-7232, the court explained that the application of this exclusion in the context of a construction project:
 [O]ften entails categorizing damages that flow from defective work into five groups: (1) the insured's work causes damage to the insured's work-to which the exclusion applies; (2) the insured's work is damaged by a subcontractor-to which the exclusion does not apply; (3) a subcontractor's work is damaged by the insured['s] improperly performed work-to which the exclusion does not apply; (4) a subcontractor's work damaged by improperly performed work by one or more subcontractors-to which the exclusion does not apply; and (5) damage to third-party property is caused by improperly performed work of the insured or others working on its behalf-to which the exclusion does not apply.
Id. at ¶ 42 (quoting 4 Bruner O'Connor on Construction Law § 11:46, at 159 (2002)). Accordingly, because the exclusion only applies to property damage to "your work" arising out of "your work," it only applies in this case if Quality's work caused damage to Quality's work.
 {¶ 29} Quality's out-of-plumb installation of the windows did not cause property damage to other work performed by Quality. Rather, it caused damage to third-party property, specifically, the Hannas' prefabricated windows' cranks and gears. This Court, therefore, concludes that neither "your work" exclusion applies to the Hannas' window claims. The Hannas' assignment of error is sustained.
 CONCLUSION {¶ 30} Ohio Casualty and Motorists Mutual must share the cost of indemnifying Quality for the damage to the Hannas' drywall, doors, wood trim, roof shingles, and casement windows because those collateral damages arose out of the crooked framing of the house. The judgment *Page 13 
of the trial court is reversed, and this matter is remanded for the entry of an order consistent with this opinion.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellees.
 SLABY, J., MOORE, P. J., CONCURS. *Page 1